[808 NYS2d 447]

CATHOLIC CHARITIES OF THE DIOCESE OF ALBANY et al., Appellants, v GREGORY V. SERIO, as Superintendent of Insurance, Respondent.

Third Department, January 12, 2006

## APPEARANCES OF COUNSEL

*Tobin & Dempf, L.L.P.*, Albany (*Michael L. Costello* of counsel), for appellants.

*Eliot Spitzer, Attorney General*, New York City (*Shaifali Puri* of counsel), for respondent.

*Hancock & Estabrook, L.L.P.*, Syracuse (*John G. Powers* of counsel), for United States Conference of Catholic Bishops and others, amici curiae.

*Wilmer Cutler Pickering Hale & Dorr, L.L.P.*, Washington, D.C. (*A. Stephen Hut Jr.* of counsel), for American College of Obstetricians and Gynecologists and others, amici curiae.

*Diana Kasdan, American Civil Liberties Union Foundation*, for American Civil Liberties Union Foundation, and *Anna Schissel, New York Civil Liberties Union Foundation*, for New York Civil Liberties Union Foundation, New York City, amici curiae.

*Eve C. Gartner, Planned Parenthood Federation of America*, New York City, for American Jewish Congress and others, amici curiae.

*Mordechai Biser, Agudath Israel of America*, New York City, for Agudath Israel of America, amicus curiae.

## OPINION OF THE COURT

MERCURE, J.

This appeal presents constitutional and statutory questions

flowing from a legislative enactment requiring employers that provide group insurance coverage for prescriptions to include prescription contraceptives in that coverage. The appeal is brought by a number of employers that are all religious organizations, but that do not qualify for the narrow statutory exemption for "religious employers."

I. Facts

In 2002, the Legislature enacted the Women's Health and Wellness Act (hereinafter WHWA), a comprehensive statutory initiative to improve group health insurance benefits for women's preventative health care. Provisions of the WHWA require group insurance policies and contracts to include coverage for obstetric and gynecologic care, periodic mammography and cervical cytology screenings, and bone density exams, among other things (see L 2002, ch 554). The WHWA further requires that any group insurance that includes coverage for prescription drugs must also include a rider providing coverage for the cost of prescribed contraceptive drugs or devices (see Insurance Law § 3221 [l] [16]; § 4303 [cc]). In this action, plaintiffs challenge this "contraceptive mandate."

The WHWA provides two avenues by which an employer that offers its employees group health insurance may avoid providing coverage for prescription contraceptives. First, any employer that does not want to provide contraceptive coverage can offer its employees insurance that does not include prescription coverage at all (see Insurance Law § 3221 [l] [16]; § 4303 [cc] [expressly requiring contraceptive coverage only in policies and contracts "which provide[ ] coverage for prescription drugs"]). Second, the WHWA includes an express exemption for "religious employer[s]" if prescription contraceptive methods are "contrary to the religious employer's religious tenets" (Insurance Law § 3221 [l] [16] [A]; § 4303 [cc] [1]). The exemption defines a "religious employer" as an entity that satisfies four criteria: (1) the inculcation of religious values is the purpose of the entity; (2) the entity primarily employs persons who share the religious tenets of the entity; (3) the entity serves primarily persons who share the religious tenets of the entity; and (4) the entity is a nonprofit organization as described in 26 USC § 6033 (a) (2) (A) (i) or (iii) (Internal Revenue Code of 1986, as amended) (Insurance Law § 3221 [l] [16] [A] [1]; § 4303 [cc] [1] [A] [hereinafter the exemption]).

Plaintiffs are all faith-based entities that operate a broad array of ministries in areas of human services such as health care,

education and job placement, counseling, and a wide variety of services to the poor and needy. Each plaintiff is either operated in association with a diocese of the Roman Catholic Church or is a Baptist Church itself, but every plaintiff acknowledges that as a ministry, its primary purpose is not the inculcation of religious values. All of the plaintiffs minister to all people irrespective of faith. Four of the plaintiffs claim nonprofit status under 26 USC § 6033 (a) (2) (A) (i) or (iii), but only with respect to their status as a church or religious order; no plaintiff claims such nonprofit status with respect to its ministry. While some of the plaintiffs objected to their insurance companies expanding their employees' prescription coverage to include contraceptives, all plaintiffs readily recognized that they do not satisfy the requirements for the exemption.

Plaintiffs assert that contraception is contrary to their religious tenets. They also assert that in accordance with religious teachings, they bear a moral obligation to offer their employees fair, adequate and just employment benefits, which they view as including prescription drug coverage. From plaintiffs' perspective, the WHWA leaves them with a Hobson's choice: either decline to provide coverage for the cost of all prescription drugs or extend coverage for contraceptives, neither of which they view as an acceptable option.

Plaintiffs commenced this action seeking declaratory and injunctive relief, and they moved for a preliminary injunction prohibiting enforcement of the WHWA. Defendant answered and cross-moved for summary judgment dismissing the complaint. Supreme Court granted defendant's motion and dismissed the complaint, and plaintiffs appeal.

Plaintiffs' constitutional challenges to the WHWA all fall within the Religion clauses of the United States and New York constitutions (US Const First Amend; NY Const, art I, § 3). We first address their pure free exercise claims, which rely primarily on the state Free Exercise Clause. Next we turn to plaintiffs' "hybrid" claims (see *Employment Div., Dept. of Human Resources of Ore. v Smith*, 494 US 872, 881-882 [1990]), in which they seek to link their free exercise claims with free speech claims. We then address plaintiffs' arguments founded on precepts of Establishment Clause jurisprudence and predicated upon a distinction that the exemption draws between religious entities' ecclesiastical and ministerial activities. These include contentions that the exemption is a prohibited gerrymander under *Larson v Valente* (456 US 228 [1982]), and that the

WHWA constitutes an unconstitutional intrusion into church autonomy. Finally, plaintiffs contend that the WHWA violates various provisions of New York's Human Rights Law and Religious Corporations Law. Because we ultimately conclude that the WHWA and the religious employer exemption violate neither constitutional nor statutory provisions, we affirm.

## II. Threshold Issues

Plaintiffs concede that the WHWA was duly enacted, and thus, their arguments addressed to the constitutionality of the WHWA must overcome certain presumptions and meet certain standards. "Legislative enactments enjoy a strong presumption of constitutionality" (*LaValle v Hayden*, 98 NY2d 155, 161 [2002] [citations omitted]; *see Dalton v Pataki*, 11 AD3d 62, 89 [2004], *mod on other grounds* 5 NY3d 243 [2005], *cert denied* — US —, 126 S Ct 742 [2005]), and it is presumed that "the Legislature has investigated and found facts necessary to support the legislation" together with "the existence of a situation showing or indicating its need or desirability" (*Hotel Dorset Co. v Trust for Cultural Resources of City of N.Y.*, 46 NY2d 358, 370 [1978]; *see De Veau v Braisted*, 5 NY2d 236, 241-242 [1959]). Accordingly, "parties challenging a duly enacted statute face the initial burden of demonstrating the statute's invalidity 'beyond a reasonable doubt' " (*LaValle v Hayden, supra* at 161, quoting *People v Tichenor*, 89 NY2d 769, 773 [1997], *cert denied* 522 US 918 [1997]; *see Matter of Klein [Hartnett]*, 78 NY2d 662, 666 [1991], *cert denied* 504 US 912 [1992]).

## III. Constitutional Issues

Plaintiffs devote a significant portion of their brief to discussion of the religious beliefs that are affected by the WHWA and the undeniably substantial burden that the WHWA imposes upon those beliefs. The implication of this discussion is that religious beliefs that are deeply and strongly held are, by virtue of US Constitution First Amendment and NY Constitution, article I, § 3, impenetrable by civil law. But that simply is not so. Religion and religious institutions exist within a civil society, and notwithstanding the constitutional protection accorded religious freedoms, conflicts inevitably arise between religious adherents and government when the latter exercises its obligation to order a civil society (*see Lemon v Kurtzman*, 403 US 602, 614 [1971] ["total separation (between church and state) is not possible in an absolute sense"]; *Walz v Tax Comm'n of City of New York*, 397 US 664, 670 [1970] ["the very existence of the Religion Clauses is an involvement of sorts—one that seeks to

mark boundaries to avoid excessive entanglement"]). Such conflicts are resolved by review of the claimed constitutional right and the allegedly unconstitutional governmental action within the established framework of constitutional analysis. Ultimately, the question is not whether the civil law has an effect upon religion, but whether that effect violates the boundaries established by constitutional jurisprudence (*see Boy Scouts of America v Dale*, 530 US 640 [2000] [association]; *Employment Div., Dept. of Human Resources of Ore. v Smith, supra* [free exercise]; *Spence v Washington*, 418 US 405 [1974] [free speech]; *Lemon v Kurtzman, supra* [establishment]). Here, while we recognize the burdens imposed upon plaintiffs' sincerely held religious beliefs by the WHWA's contraceptive coverage mandate,[1] and the dilemma in which plaintiffs find themselves, our analysis leads us to the conclusion that the challenged provisions of the WHWA are not unconstitutional.[2]

A. Free Exercise

■ The Free Exercise Clause of the First Amendment, which applies to the states by virtue of the Fourteenth Amendment (*see Cantwell v Connecticut*, 310 US 296, 303 [1940]), guarantees that government shall make no law "prohibiting the free exercise" of religion. New York's Bill of Rights provides:

> "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind; and no person shall be rendered incompetent to be a witness on account of his or her opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so

1. We decline plaintiffs' invitation to reverse Supreme Court's order on the ground that triable issues of material fact exist with respect to the burdens imposed upon plaintiffs' religious beliefs—the record adequately supports the point without contradiction.

2. In 1999, the California Legislature enacted the Women's Contraception Equity Act (hereinafter WCEA), which required certain group policies that offered prescription coverage to include coverage for prescription contraceptives (Cal Health & Safety Code § 1367.25; Cal Ins Code § 10123.196). The WCEA's four-pronged definition of a "religious employer" was adopted verbatim by the New York Legislature in the WHWA (*see* Insurance Law § 3221 [*l*] [16] [A] [1]; § 4303 [cc] [1] [A]; Cal Health & Safety Code § 1367.25 [b] [1]; Cal Ins Code § 10123.196 [d] [1]). The constitutionality of the WCEA has been upheld by the California Supreme Court in *Catholic Charities of Sacramento, Inc. v Superior Ct.* (32 Cal 4th 527, 85 P3d 67 [2004], *cert denied* 543 US 816 [2004]), a decision which we find highly instructive on many points in this appeal.

construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state" (NY Const, art I, § 3).

Although invoking the First Amendment, plaintiffs do not analyze or expressly argue a federal Free Exercise Clause claim; rather, they rely heavily upon the state constitutional provision, which, they argue, provides broader protection than does the federal Free Exercise Clause. Our analysis must nevertheless begin with review of plaintiffs' claim under the First Amendment of the US Constitution.

1. First Amendment Free Exercise Clause

While the United States Supreme Court previously applied strict scrutiny—requiring a state to show a compelling interest justifying a burden on an individual's freedom to exercise religious beliefs (*see Sherbert v Verner,* 374 US 398, 403 [1963])—there is little dispute that the current analysis for violations of the Free Exercise Clause of the First Amendment is framed in *Employment Div., Dept. of Human Resources of Ore. v Smith* (494 US 872 [1990], *supra*). "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice" (*Church of Lukumi Babalu Aye, Inc. v Hialeah,* 508 US 520, 531 [1993]). Only a law that does not meet the interrelated requirements of neutrality and general applicability will be subject to strict scrutiny (*id.* at 531-532, 546). "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral" (*id.* at 533). Similarly, a law is not generally applicable if it "in a selective manner impose[s] burdens only on conduct motivated by religious belief" (*id.* at 543).

The WHWA and its provisions apply to every group health insurance policy and contract delivered or issued for delivery in New York (*see* Insurance Law § 3221 [a]; § 4303 [a]) and, accordingly, every employer in the state that offers group health insurance is subject to the statute. The WHWA does not selectively impose any burden on conduct motivated by religious belief and is therefore generally applicable (*see Employment Div., Dept. of Human Resources of Ore. v Smith, supra* at 879-880; *see also United States v Lee,* 455 US 252, 258 [1982]). The inclusion of an exemption for a narrow class of employers, which exempts them with respect to only one aspect of the mandated coverage, does not undermine a conclusion that the law is generally applicable (*see United States v Lee, supra* at 260-261).

The object of a law, i.e., its neutrality (*see Church of Lukumi Babalu Aye, Inc. v Hialeah, supra* at 533), is evaluated both facially and by the effect of the law in its operation (*see id.* at 533-535; *Grumet v Pataki*, 93 NY2d 677, 688-689 [1999], *cert denied* 528 US 946 [1999], citing *Grumet v Cuomo*, 90 NY2d 57, 70 [1997]). Neutrality and general applicability are intertwined (*see Church of Lukumi Babalu Aye, Inc. v Hialeah, supra* at 531) and here, the analysis of the WHWA's neutrality does not depart from the analysis of its general applicability. The WHWA as a whole is facially neutral, and its object—to increase women's access to health care—does not target religious practices (*compare id.* [object of the enactments was to prevent one religious group from performing religious rituals]). To the extent that plaintiffs' arguments that the WHWA is not neutral derive from the exemption for religious employers, they are inapt in the analysis of plaintiffs' free exercise claims, and are properly analyzed under First Amendment Establishment Clause principles (*see e.g. Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v Amos*, 483 US 327, 334-336 [1987]; *Catholic Charities of Sacramento, Inc. v Superior Ct.*, 32 Cal 4th 527, 551, 85 P3d 67, 83 [2004], *cert denied* 543 US 816 [2004]; *see also United States v Lee, supra* at 260-261 [plaintiffs' rights deriving from the Free Exercise Clause are not implicated by the inclusion of an exemption that accommodates some religious adherents other than plaintiffs]).

In sum, the WHWA easily satisfies the test of *Smith*, and thus, while it incidentally imposes a burden on plaintiffs' free exercise rights, we find that it does not violate the Free Exercise Clause of the First Amendment.

### 2. NY Constitution

Plaintiffs argue that NY Constitution, article I, § 3 affords greater protection than under the federal Free Exercise Clause. To be sure, the language of the two constitutional clauses is different—the First Amendment broadly and summarily protects "the free exercise" of religion, while New York's Free Exercise Clause protects the "free exercise and enjoyment of religious profession and worship," further stating that "the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state" (NY Const, art I, § 3). Plaintiffs contend that a "compelling interest" test should be employed to review state free exercise claims. They further assert that the language of the state Free Exercise Clause expressly limits the

state interests that may intrude upon free exercise of religion to those interests which protect against a substantial threat to the peace and safety of the state.

In reviewing state free exercise claims, the Court of Appeals has applied a test that balances " 'the interest of the individual right of religious worship against the interest of the [s]tate which is sought to be enforced' " (*People ex rel. DeMauro v Gavin*, 92 NY2d 963, 964 [1998], quoting *People v Woodruff*, 26 AD2d 236, 238 [1966], *affd* 21 NY2d 848 [1968]). Each time the issue has come before the Court of Appeals, it has applied this balancing test (*see People ex rel. DeMauro v Gavin, supra*; *La Rocca v Lane*, 37 NY2d 575, 583 [1975], *cert denied* 424 US 968 [1976]; *People v Woodruff, supra*). Indeed, in *La Rocca v Lane* (*supra*), the Court of Appeals expressly considered the "compelling state interest" standard set forth in *Sherbert v Verner* (374 US 398, 403 [1963], *supra*), but applied the balancing test previously stated by the Court in *People v Woodruff* (*supra*; *cf. Matter of Fosmire v Nicoleau*, 75 NY2d 218, 234 [1990] [Simons, J., concurring] [asserting that the Court should consider the respondents' federal and state constitutional free exercise claims, and should apply strict scrutiny thereto]). Only in the context of prison administration has the Court of Appeals articulated a quantum required of the State's interest, and then it has required that the State show only a ''legitimate'' institutional interest to outweigh state constitutional free exercise claims (*see Matter of Rivera v Smith*, 63 NY2d 501, 512 [1984]; *see also* Correction Law § 610; *Matter of Brown v McGinnis*, 10 NY2d 531, 535-536 [1962]; *Matter of Shahid v Coughlin*, 83 AD2d 8, 11 [1981], *affd* 56 NY2d 987 [1982]). Thus, we conclude that defendant need not show a ''compelling'' state interest, and that we should apply a balancing test to plaintiffs' state constitutional free exercise claims.

The balancing test is a two step process: "first, a determination whether a restriction will be . . . imposed on [plaintiffs'] freedom of worship; and secondly, a determination whether the presence of a restriction is justified, after a consideration of the social and constitutional values involved" (*People v Woodruff, supra* at 238).

We begin this process with the recognition that plaintiffs' religious beliefs are sincerely held, and that in their view, their religious dilemma can be resolved only by a finding that the WHWA is unconstitutional because the exemption is not broad

enough to include them.[3] We do not question the veracity or strength of plaintiffs' convictions (*see Employment Div., Dept. of Human Resources of Ore. v Smith*, 494 US 872, 887 [1990], *supra*; *United States v Lee*, 455 US 252, 257 [1982], *supra*), and we accept their assertions that the qualified mandated coverage for prescription contraceptives burdens their free exercise rights.

Turning to the social issues involved in this constitutional dispute, we reject plaintiffs' constricted reading of NY Constitution, article I, § 3 which, they contend, expressly limits the scope of the state interest to only those matters that are narrowly in pursuit of "peace or safety or . . . limiting licentiousness." While plaintiffs generally argue the limitations purportedly imposed by these terms, their arguments do not address the fact that the interests of the State in peace and safety extend far beyond protection of the citizenry from disorderly or criminal behavior, and include such interests as medical care and gender equality (*see* Executive Law § 290 [3] [declaring that lack of equal opportunity because of, among other things, discrimination and health care, "threatens the peace, order, health, safety and general welfare of the state and its inhabitants"]). The importance of the conjoined interests of gender equality and health care—which the WHWA seeks to address—is well documented.[4]

---

**3.** We note that plaintiffs do not seek a "constitutionally required exemption" from the WHWA (*United States v Lee*, 455 US 252, 256 [1982], *supra*), but rather seek a judgment declaring that the "contraceptive mandate" provisions (*see* Insurance Law § 3221 [*l*] [16]; § 4303 [cc]), and "those portions of [Insurance Law § ] 3221 (k) (13) and [§ ] 4303 (bb) dealing with contraceptive drugs and devices" are unconstitutional and unenforceable.

**4.** (*See* NY Const, art XVII, § 3 ["The protection and promotion of the health of the inhabitants of the state are matters of public concern and provision therefor shall be made . . . as the legislature shall from time to time determine"]; Executive Law § 296 [1] [a] ["It shall be an unlawful discriminatory practice . . . (f)or an employer . . . because of the . . . sex . . . of any individual . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment"]; *see also Catholic Charities of Sacramento, Inc. v Superior Ct.*, 32 Cal 4th 527, 564, 85 P3d 67, 93 [2004], *supra* [finding that the WCEA serves the compelling state interest of eliminating gender discrimination].) One commentator has noted that legislative initiatives related to mandatory provision of contraception coverage were motivated, in part, by the availability of group health insurance coverage for the male impotence medication Viagra shortly after it received FDA approval (*see* Stabile, *State Attempts to Define Religion: The Ramifications of Applying Mandatory Prescription Contraceptive Coverage Statutes to Religious Employers*, 28 Harv JL & Pub Pol'y 741, 770 [2005]).

Nor have plaintiffs rebutted the presumption that the Legislature conducted adequate fact-finding to support its enactment of the WHWA (*see Hotel Dorset Co. v Trust for Cultural Resources of City of N.Y.*, 46 NY2d 358 [1978], *supra*). Indeed, the record contains evidence that out-of-pocket costs for insured women were 68% higher than such costs for insured men, and that male-related medical care was more accessible through insurance than was female-related care, supporting the Legislature's conclusion that group health insurance coverage in this state was inequitable as between men and women. The record also bears evidence that unplanned pregnancies can have substantial negative impact on the physical, emotional and economic health of women and children, and that increased access to prescription contraceptives would address those issues. We note that the affidavit of physician Hanna Klaus, submitted in support of plaintiffs' request for a preliminary injunction, while commenting upon aspects of the use of artificial contraceptives, does not address the adequacy of the Legislature's fact-finding process.

Having defined "the social and constitutional values involved" (*People v Woodruff*, 26 AD2d 236, 238 [1966], *supra*), we proceed to balance them. We attribute substantial weight to each of the State's interests—the social value of gender equity and the health and related interests of thousands of women and children—and acknowledge that they are enhanced by their conjoined status in the WHWA. We note that despite substantial efforts over a number of years, the Legislature was unable to pass the WHWA with the broader "conscience clause" desired by plaintiffs and implicitly urged by the dissent, and thus, absent the narrow "religious employer" exemption that does not include plaintiffs, the state interests satisfied by the WHWA would never have been met.[5]

On the other side of the scale, we attribute great weight to plaintiffs' free exercise rights and the state constitutional values inherent therein. However, it cannot be overlooked that plaintiffs, in their capacities as ministries, employ people who do not share their religious beliefs. While plaintiffs' free exercise rights are not diminished by this fact, the rights—including the

5. In any event, given the lack of evidence in the record as to how plaintiffs are funded, it is unclear that any plaintiff herein would qualify for the broader exemption adopted in states such as Connecticut and Massachusetts. That exemption does not apply to organizations that normally receive more than 25% of their support from governmental sources.

paramount right of personal health—of many employees who do not share plaintiffs' views on contraceptives would be subordinated to plaintiffs' right to freely exercise their beliefs. Moreover, at least some of the plaintiffs could avoid the contraceptive coverage mandate by withholding all prescription coverage, yet meet their religious obligation to provide their employees with prescription medications through self insurance or other means (*see* Stabile, *State Attempts to Define Religion: The Ramifications of Applying Mandatory Prescription Contraceptive Coverage Statutes to Religious Employers*, 28 Harv JL & Pub Pol'y 741, 774-775 [2005]).

Reasonable minds may differ with respect to whether the WHWA and its exemption take the best path toward meeting the Legislature's stated goals, and whether the benefits of the statute will be outweighed by the potential for harm to women if employers choose not to provide prescription coverage. However, and as noted above, in the absence of a showing to the contrary, we must presume that the Legislature conducted adequate fact-finding to satisfy itself that sufficient numbers of women would be benefitted by the WHWA even if significant numbers of employers—both religious and nonreligious—chose to opt out of prescription coverage altogether (*see Hotel Dorset Co. v Trust for Cultural Resources of City of N.Y.*, 46 NY2d 358 [1978], *supra*; *De Veau v Braisted*, 5 NY2d 236, 241-242 [1959], *supra*). Moreover, "[i]t is not the role of the courts to pass upon the wisdom of the Legislature's policy choice, even though there may be differences of views about the decision" reflected in the legislation (*Hope v Perales*, 83 NY2d 563, 575 [1994]; *see Dalton v Pataki*, 5 NY3d 243, 269 [2005], *supra*). In reviewing the Legislature's public policy determinations, a court "must operate on the rule that it may not substitute its judgment for that of the body which made the decision. Judges, however much they might disagree with the wisdom of the act under review, are not free to invalidate it on that ground" (*Hotel Dorset Co. v Trust for Cultural Resources of City of N.Y., supra* at 370). All things considered, and limiting our review to the appropriate judicial inquiry, we conclude that the balance tips away from plaintiffs' right to free exercise and in favor of the WHWA, and therefore find that the WHWA does not violate NY Constitution, article I, § 3.

### B. "Hybrid" Rights

■ Relying on dictum in *Smith*, plaintiffs contend that even if their free exercise claims fail, the combination of those rights

with another First Amendment right constitutes a meritorious "hybrid" constitutional claim (*see Employment Div., Dept. of Human Resources of Ore. v Smith,* 494 US 872, 881-882 [1990], *supra*). They invoke the rights of expressive association and conduct as speech—both rights deriving from the Free Speech Clause—in support of these claims. Because we conclude that neither of these free speech claims is independently meritorious, plaintiffs' "hybrid" claim necessarily fails.

1. Expressive Association

Plaintiffs rely primarily upon *Boy Scouts of America v Dale* (530 US 640 [2000], *supra*) and *Hurley v Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.* (515 US 557 [1995]), and they offer numerous quotes from the opinions in those cases about the unconstitutional effect of requiring an entity to send a message that is inimical to or inconsistent with the entity's values or beliefs. However, although plaintiffs acknowledge that the existence of an "expressive association" of people or groups of people is an element of a First Amendment claim to associational expression (*see Forum for Academic & Institutional Rights v Rumsfeld,* 390 F3d 219, 231, 257-258 [3d Cir 2004], *cert granted* 544 US 1017 [2005]; *see generally Roberts v United States Jaycees,* 468 US 609, 617-618 [1984] [discussing the types of associational activities implicated in a challenge to an organization's exclusion of women]; *Boy Scouts of America v Dale, supra* [scouting association opposed New Jersey Law Against Discrimination which mandated inclusion of a homosexual assistant scoutmaster]; *Hurley v Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc., supra* [private organization that sponsored St. Patrick's Day parade challenged Massachusetts public accommodation law that required inclusion of gay, lesbian and bisexual group]), their complaint does not allege, nor do they persuasively argue, that the WHWA requires plaintiffs to join an expressive association. Plaintiffs' contention that they are being "grouped" in some inchoate manner with employers who provide contraceptive coverage does not demonstrate an affiliation that is sufficient to support an expressive association claim. Because plaintiffs' expressive association claim lacks this necessary factual predicate, their assertions that the WHWA violates the First Amendment in this regard are wholly without merit.

2. Conduct as Protected Speech

Plaintiffs argue that the WHWA's contraceptive coverage requirement violates their First Amendment right to free speech

because it compels them to engage in conduct that communicates a pro-contraceptive message that is contrary to their sincerely held anti-contraceptive beliefs.

As a general principle, conduct without the use of express language may be entitled to protection under the Free Speech Clause of the First Amendment (*see Spence v Washington*, 418 US 405 [1974], *supra* [display of American flag with peace symbol attached to it]; *Tinker v Des Moines Independent Community School Dist.*, 393 US 503 [1969] [students wearing black armbands to protest United States policy in Vietnam]; *Brown v Louisiana*, 383 US 131 [1966] ["sit-in" by African Americans in "whites only" library to protest segregation]). However, plaintiffs' invocation of the protections of the Free Speech Clause of the First Amendment imposes upon them the burden of establishing that the conduct upon which their free speech claim rests—here, the provision of group insurance coverage for prescription contraceptives—is expressive conduct embraced by the First Amendment (*see Clark v Community for Creative Non-Violence*, 468 US 288, 293 n 5 [1984] [stating that "(t)o hold otherwise would be to create a rule that all conduct is presumptively expressive"]). The claimed expressive conduct must be subjected to a two part test: first, does the speaker have an "intent to convey a particularized message," and second, whether "the likelihood was great that the message would be understood" by those to whom it was conveyed (*Spence v Washington, supra* at 410-411; *see Clark v Community for Creative Non-Violence, supra* at 293 [majority], 305 [Marshall, J. dissenting]). Moreover, the intent of the actor and the comprehension of the audience must be viewed within the factual context and environment of the conduct (*see Clark v Community for Creative Non-Violence, supra* at 294, 305-306; *see Spence v Washington, supra* at 410).

Clearly, plaintiffs do not intend their provision of contraceptive coverage to convey a particularized message *endorsing* contraceptive use.[6] Accepting that plaintiffs' conduct does convey a message about contraceptives, we do not agree with plaintiffs' assertion that they will be perceived as endorsing contraceptives, especially in light of the context in which plaintiffs are obligated to provide contraceptive coverage.

---

6. We note that the argument that plaintiffs' conduct is constitutionally-protected speech is not enhanced because religion is involved. Rather, the "religious" aspects of the conduct fall within the ambit of the Free Exercise Clause.

Plaintiffs, like all others in the state who provide group health insurance for prescription coverage, must comply with a statutory mandate. Given plaintiffs' well-known religious beliefs regarding contraception, we cannot conclude that there is a "great likelihood" that plaintiffs' provision of contraceptive coverage to its employees would be perceived as anything more than compliance under protest with a statutory mandate that is generally applicable to all employers offering group health insurance coverage, rather than conduct undertaken for an expressive purpose.

While we certainly accept the fundamental principle underlying plaintiffs' "conduct as speech" argument—that the right to freedom of speech necessarily incorporates the right to refrain from speaking (*see Wooley v Maynard*, 430 US 705, 714 [1977])—the dissent forgoes the two-step analysis that is required to determine, in the first instance, whether the conduct sought to be protected is, in fact, constitutionally protected speech (*see Clark v Community for Creative Non-Violence, supra* at 293; *Spence v Washington, supra* at 410-411; *compare Wooley v Maynard, supra* at 713-715 [predating *Clark*, and involving the imposed display of express language—a government slogan—on private property]). Moreover, the dissent's conclusion that the WHWA requires offensive speech on pain of penalty rests on conjecture that plaintiffs may suffer disadvantage in the competitive employment marketplace, and lacks the support of an objective and severe sanction (*compare Abood v Detroit Bd. of Ed.*, 431 US 209, 234 [1977] [loss of public employment]; *Wooley v Maynard, supra* at 708 [criminal penalties]; *Miami Herald Publishing Co. v Tornillo*, 418 US 241, 244 [1974] [criminal penalties]). Because plaintiffs have not met their burden of establishing that the conduct imposed upon them is constitutionally-protected speech, this free speech claim fails.

Finding that plaintiffs have adequately stated a hybrid free exercise/free speech claim, the dissent proceeds to apply strict scrutiny to the WHWA, and concludes that the state's asserted interests in gender equity and women's health care are undermined, and that the statute is not narrowly tailored because it encourages nonexempt religious organizations to opt out of providing prescription coverage. While we disagree with the determination to apply strict scrutiny in the first instance, we note that this analysis fails to acknowledge the compelling state interests at issue, and ignores the unrebutted presumption that the Legislature conducted adequate fact-finding with respect to the effect of the opt-out provision.

## C. Establishment Clause

■ Plaintiffs assert challenges to the contraceptive coverage mandate under the Establishment Clause of the First Amendment.[7] At the outset, a distinction must be drawn between plaintiffs' facial challenges to the WHWA and challenges to the statute as applied, because the former are properly before us; the latter are not (*see generally Bowen v Kendrick,* 487 US 589, 600-602 [1988]). Plaintiffs devote substantial attention to the entanglement problems they anticipate will arise when a religious entity's claim to the exemption is disputed or reviewed. But in this case, no plaintiff claimed the exemption, nor has any challenged a determination that they were not entitled to it, and thus, no entanglement issues are before this Court (*see Catholic Charities of Sacramento, Inc. v Superior Ct.,* 32 Cal 4th 527, 546-547, 85 P3d 67, 80-81 [2004], *supra*).

Plaintiffs' facial challenges to the exemption from the contraceptive coverage mandate are articulated in the following manner. They contend that courts may not draw a distinction between religious and secular activity, and they argue that the exemption is a prohibited gerrymander, in violation of principles set forth in *Larson v Valente* (456 US 228 [1982], *supra*). They also assert that the statute offends the doctrine of "church autonomy."

### 1. *Lemon v Kurtzman* (403 US 602 [1971])

Plaintiffs have not articulated these discrete and narrow arguments within the well established *Lemon* test that is applied to Establishment Clause claims, as we must.[8] "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits

**7.** Although the complaint in this action states separate causes of action under the NY Constitution, plaintiffs' brief to this Court does not argue any independent state Establishment Clause right, and thus, we will consider plaintiffs' Establishment Clause claims only under the First Amendment. We note that like the Free Exercise Clause of the First Amendment, the Establishment Clause is applicable to the states by virtue of the Fourteenth Amendment (*Roemer v Board of Public Works of Md.,* 426 US 736, 743 n 6 [1976]). In the absence of an argument addressed specifically to the "preference clause" of the NY Constitution, we deem such a claim to be abandoned (*see Matter of Schulz v New York State Legislature,* 5 AD3d 885, 888 n 2 [2004], *lv dismissed* 2 NY3d 793 [2004], *lv denied* 3 NY3d 606 [2004]).

**8.** While the *Lemon* test has been slightly modified in the context of governmental aid to religious schools (*see Mitchell v Helms,* 530 US 793, 807-808 [2000]), the test remains applicable to review Establishment Clause issues in other factual contexts (*see Ehlers-Renzi v Connelly School of the Holy Child, Inc.,* 224 F3d 283, 288 [4th Cir 2000], *cert denied* 531 US 1192 [2001]).

religion . . . ; finally, the statute must not foster 'an excessive government entanglement with religion' " (*Lemon v Kurtzman,* 403 US 602, 612-613 [1971], *supra* [citations omitted]; *see Bowen v Kendrick, supra* at 602). The first prong of the *Lemon* analysis is not implicated by plaintiffs' arguments. Rather, plaintiffs' arguments are addressed to the second and third prongs of the *Lemon* analysis.

Manifestly, under *Lemon*'s second prong, the principal or primary effect of the WHWA as a whole is not the advancement or inhibition of religion, and plaintiffs do not contend otherwise; rather, they focus their arguments on the "religious employer" exemption and their view that it favors some religious groups over others. Drawing a distinction between religious and secular activities or purposes does not, on its face, offend the Establishment Clause (*see e.g. Bowen v Kendrick, supra* at 609 [discussing *Bradfield v Roberts,* 175 US 291 (1899)]; *Roemer v Board of Public Works of Md.,* 426 US 736, 746-747 [1976]). And the Establishment Clause is not necessarily offended when such a distinction provides the basis for an exemption from an otherwise generally applicable law (*see Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v Amos,* 483 US 327, 334-335 [1987], *supra; Catholic Charities of Sacramento, Inc. v Superior Ct., supra*). Plaintiffs generally contend— and the dissent agrees—that the exemption favors religious worship over religious-based ministry, and that it discriminates between religious institutions that are devoted solely to ecclesiastical purposes and religious institutions whose ministries are a part of the institution. While plaintiffs' objection is understandable, they do not explain how this distinction advances or inhibits religion within the meaning of *Lemon*'s second prong.

Rather, the distinction between secular and sectarian generally gives rise to Establishment Clause problems within the confines of the third prong of the *Lemon* test. That is, excessive entanglement between church and state may occur when the government performs an individualized inquiry into whether a particular entity's activities are religious or secular, "because [the inquiry] involves [government] officials in the definition of what is religious" (*Espinosa v Rusk,* 634 F2d 477, 481 [10th Cir 1980], *affd* 456 US 951 [1982]; *see Matter of Holy Spirit Assn. for Unification of World Christianity v Tax Commn. of City of N.Y.,* 55 NY2d 512 [1982]; *University of Great Falls v National Labor Relations Bd.,* 278 F3d 1335, 1342 [DC Cir 2002]).

The exemption in the WHWA sets forth four facially objective criteria which are to be ascertained by the religious entity itself, and it provides that upon request, a "contract *shall* be provided without coverage for contraceptive methods" (Insurance Law § 3221 [*l*] [16] [A]; § 4303 [cc] [1] [emphasis added]). The exemption does not require any government official or designee to make a determination between religious and secular, and plaintiffs make no claim that such a governmental inquiry has been undertaken pursuant to the WHWA. The record reveals that some insurance companies have required plaintiffs to submit an affidavit or affirmation stating that they meet each of the four statutory criteria and are thus entitled to the exemption; no plaintiff in this action submitted such a statement, and there is no evidence that any insurer has ever looked beyond such a submission or the lack thereof. Thus, the statute, on its face, does not give rise to excessive entanglement between church and state.

We nevertheless acknowledge that the exemption may pose entanglement problems if an agency or court were required to consider the extent to which a particular plaintiff's ministerial activities are motivated by and infused with ecclesiastical and proselytizing purposes (*see Matter of Holy Spirit Assn. for Unification of World Christianity v Tax Commn. of City of N.Y., supra* at 521). Indisputably, as the dissent asserts, many religious organizations—including plaintiffs—view acts of charity and corporal works of mercy as manifestations of religious expression and a method of inculcating religious values. Moreover, we readily concede that "it is a significant burden on a religious organization to require it . . . to predict which of its activities a secular court will consider religious" (*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v Amos, supra* at 336). In their complaint, however, plaintiffs expressly conceded that they do not qualify for the exemption because their "primary focus . . . is not the inculcation of religious values" and because they both employ and serve people of many faiths. Inasmuch as no plaintiff ever claimed the exemption, a potentially entangling inquiry into plaintiffs' religious duty to inculcate religious values and spread the faith through their ministries was never conducted, and thus, this action gives us no occasion to consider an "as applied" challenge to the constitutionality of the exemption (*see Catholic Charities of Sacramento, Inc. v Superior Ct.*, 32 Cal 4th 527, 546-547, 85 P3d 67, 80-81 [2004], *supra*).

## 2. *Larson v Valente* (456 US 228 [1982])

Despite withstanding constitutional muster under the *Lemon* test, plaintiffs contend that the exemption discriminates between religious denominations in violation of *Larson v Valente* (456 US 228 [1982], *supra*). We do not agree.

In *Larson*, the United States Supreme Court invalidated a statutory provision that imposed registration and reporting requirements upon religions that received 50% or more of their contributions from members or affiliated organizations (*id.* at 231-232). The Court stated that the Establishment Clause's "clearest command . . . is that one religious denomination cannot be officially preferred over another" (*id.* at 244), and clearly indicated that denominational neutrality requires that the government remain neutral *as between sects* (*id.* at 246). In this regard, the Court noted that the statute enacted by the Minnesota Legislature "does not operate evenhandedly, nor was it designed to do so: The [50%] rule . . . effects the *selective* legislative imposition of burdens and advantages upon particular denominations" (*id.* at 253-254). Indeed, the legislative history revealed that the statute had been drawn specifically to address the fund-raising practices of the Unification Church, referred to by one legislator as "the Moonies" (*see id.* at 254-255).

In this case, the four criteria set forth in the exemption exclude religious organizations whose purposes include activities other than the inculcation of religious values (*see* Insurance Law § 3221 [*l*] [16] [A] [1] [a]; § 4303 [cc] [1] [A] [i]). Thus, as revealed by the presence of the Baptist Church plaintiffs, the statute facially distinguishes between those religious institutions that create separate legal entities for their ecclesiastical and ministerial activities, and those religious institutions that do not. However, the line drawn in this case does not discriminate between religions or sects (*see Catholic Charities of Sacramento, Inc. v Superior Ct., supra*, 32 Cal 4th at 553-554, 85 P3d at 85). This is demonstrated by the fact that most of the plaintiffs in this action are affiliated with a Catholic diocese, and while the statute may provide the dioceses themselves with the exemption, it is unavailable to the plaintiffs that are affiliated Catholic entities. Accordingly, plaintiffs' claim that the WHWA includes an unconstitutional religious gerrymander under *Larson* is without merit because the exemption does not distinguish between religions or sects.

This conclusion is not undermined by references in the legislative record to the Catholic Church, or by the fact that an earlier

version of the WHWA included a broad religious-based exemption that would have applied to any "group or entity [that] is operated, supervised or controlled by or in connection with a religious organization or denominational group or entity" (2001 NY Senate Bill S 5626, § 13; *see* 2001 NY Senate Bill S 3, § 11). Rather, the record reveals that the WHWA was caught in a legislative stalemate for a period of years in part because of the competing interests that were lobbied by the Catholic Church on one side, and advocates for women's health and gender equity on the other. While the record reveals that the Legislature narrowed the exemption with an eye toward accommodating the Catholic Church, the narrow exemption was adopted in an exercise of political compromise. The legislative record provides no basis for us to either discern or attribute a legislative intent to limit the exemption to the Catholic Church or to preclude other denominations from invoking it, and, as we have noted, it does not have that effect.

### 3. Church Autonomy

The principal flaw in plaintiffs' invocation of "church autonomy" is that the doctrine primarily requires the civil judiciary to defer to ecclesiastical tribunals on matters related to governance of a hierarchical church (*see Serbian Eastern Orthodox Diocese for United States & Canada v Milivojevich*, 426 US 696, 708-709 [1976] [dispute concerning the divestiture of a bishop and the validity of the division of one diocese into three]; *Kedroff v Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 US 94 [1952] [dispute between the Russian Orthodox Church in America and its Russian counterpart over the power to appoint the North American Archbishop]; *First Presbyt. Church of Schenectady v United Presbyt. Church in U.S. of Am.*, 62 NY2d 110, 116 [1984] [dispute over local church's right to withdraw from the superior church bodies]). In other words, the doctrine of church autonomy applies to prevent civil government from "lend[ing] its power to one or the other side in controversies over religious authority or dogma" (*Employment Div., Dept. of Human Resources of Ore. v Smith*, 494 US 872, 877 [1990], *supra*; *see Catholic Charities of Sacramento, Inc. v Superior Ct., supra,* 32 Cal 4th at 541-543, 85 P3d at 76-78). To the extent that *Kedroff* requires the Legislature to refrain from enacting laws that interfere with church governance, such a rule implicates the Free Exercise Clause (*Kedroff v Saint Nicholas Cathedral of Russian Orthodox Church in North America, supra* at 117-121), and we have previ-

ously concluded that the WHWA does not impermissibly intrude upon plaintiffs' free exercise rights.

Moreover, plaintiffs' general assertions that the WHWA is unconstitutional because the contraception coverage mandate interferes with their relationships with their employees and constitutes an impermissible reach into the church treasury are novel contentions which, in our view, find no support in the law (*see Tony & Susan Alamo Foundation v Secretary of Labor*, 471 US 290, 303-306 [1985] [imposition of minimum wage and recordkeeping requirements does not violate Establishment or Free Exercise clauses]; *see also United States v Lee*, 455 US 252 [1982], *supra* [free exercise rights not violated by requirement to pay employment taxes]). This case simply does not involve a civil intrusion into internal church dispute resolution and, therefore, plaintiffs' "church autonomy" argument is unavailing.

IV. State Statutory Issues

A. Human Rights Law

■ The parties agree that group health insurance is a benefit of employment protected by the Human Rights Law. Plaintiffs cite Executive Law § 296 (11), which states in relevant part:

"Nothing contained in this section shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting employment . . . to persons of the same religion or denomination *or from taking such action as is calculated by such organization to promote the religious principles for which it is established or maintained* " (emphasis added).

Plaintiffs contend that this provision preempts the area of the employer-employee relations when a religious-related employer is involved. They assert that Executive Law § 296 (11) is an exclusive authority, and that it permits them to decline to provide their employees with coverage for contraceptives.[9]

Initially, we note that the doctrine of preemption, which is generally employed to resolve federal-state statutory conflicts, has no application in this claimed conflict between two provi-

---

**9.** We express no view on whether the exemption from the Human Rights Law would include such an action, if taken by plaintiffs.

sions of state law. To the extent that plaintiffs present an issue of statutory construction on the ground that the contraceptive coverage mandate of the WHWA conflicts with the exemption for religious-related employers from the application of Executive Law § 296, nothing in Executive Law § 296 (11) suggests that the Legislature may not, in another section of law, impose affirmative requirements upon religious-related employers. Executive Law § 296 (11) merely excuses such employers from compliance with Executive Law § 296. Accordingly, plaintiffs' reliance on Executive Law § 296 (11) is without merit.

B. Religious Corporations Law

■ Plaintiffs argue that certain provisions of the Religious Corporations Law "explicitly subordinated" the WHWA to the governance of religious denominations and their ecclesiastical governing bodies, and hence, the Legislature may not impose the contraceptive coverage mandate upon the Baptist Church plaintiffs, which are religious corporations. As relevant here, "[t]he primary purpose of the Religious Corporations Law is to provide an orderly method for the administration of the property and temporalities dedicated to the use of religious groups" (*Morris v Scribner*, 69 NY2d 418, 423 [1987]). Plaintiffs cite Religious Corporations Law §§ 5 and 26, which address the powers and duties of the trustees of religious corporations and the authority to control the "times, nature or order" of worship, respectively. As noted by Supreme Court, there is nothing in these provisions that purports to insulate plaintiffs from a generally applicable law such as the WHWA. Accordingly, we conclude that plaintiffs' reliance on the Religious Corporations Law is unavailing.

V. Conclusion

In sum, in enacting the WHWA, the Legislature provided an exemption from the contraceptive coverage mandate which generally includes religious institutions in their capacity as ecclesiastical bodies, but which may not include religious institutions in their capacity as ministries. As we have noted, the contraceptive coverage mandate burdens plaintiffs' right to freely exercise their religious beliefs. However, despite this burden, our review of the WHWA and its exemption for "religious employers" leads us to the conclusion that the WHWA does not offend the constitutional or statutory provisions invoked by plaintiffs. Moreover, while we are mindful that the exemption could give rise to entanglement problems if a court or agency were asked to determine what types of religious activ-

ity constitute the inculcation of religious values, such an inquiry is not presented here in light of plaintiffs' concessions that their primary focus is not the inculcation of religious values. To the extent that any of the arguments asserted in plaintiffs' brief are not explicitly addressed herein, they have been thoroughly considered and found to be lacking in merit.

CARDONA, P.J. (dissenting). Inasmuch as we cannot agree that the Women's Health and Wellness Act (hereinafter WHWA) comports with various clauses of the First Amendment of the US Constitution, as well as comparable provisions of the NY Constitution, we respectfully dissent.

I. Introduction and Legislative Overview of the WHWA

Significantly, over 20 states currently have statutes addressing the issues of prescription contraceptive coverage and gender equity in the provision of health care. The difficulty in reconciling legitimate concerns over gender equity in public health and the interest in accommodating the beliefs of religious entities has produced legislation that is by no means uniform. Certain states have chosen not to include any religious exemption and any employer who provides prescription coverage to its employees must include coverage for contraceptives (*see e.g.* Ga Code Ann § 33-24-59.6; 215 Ill Comp Stat 5/356z.4; Iowa Code § 514C.19; NH Rev Stat Ann §§ 415:18-i, 420-A:17-c, 420-B:8-gg; Vt Stat Ann tit 8, § 4099c; Va Code Ann § 38.2-3407.5:1). A few states, including California (*see* Cal Health & Safety Code § 1367.25; Cal Ins Code § 10123.196), have enacted contraceptive equity laws that include exemptions so narrowly drawn that only religious organizations serving in their alleged ecclesiastical capacity, as opposed to their so-called "secular" endeavors, can exclude contraceptive coverage from their prescription benefits (*see e.g.* Ariz Rev Stat § 20-826; Ark Code Ann § 23-79-1102; Haw Rev Stat §§ 431:10A-116.6, 431:10A-116.7; NC Gen Stat § 58-3-178). In contrast, the majority of states have enacted contraceptive statutes that contain broadly worded exemptions which include definitions of religious organizations[1] that would encompass church-controlled entities such as

---

**1.** For example, Connecticut, Massachusetts, Rhode Island and West Virginia utilize a broad exemption which includes, inter alia, the federal definition of "church-controlled organizations" contained in 26 USC § 3121 (w):

"(3) Definitions.

"(A) For purposes of this subsection, the term 'church' means a church, a convention or association of churches, or an elementary or secondary school which is controlled, operated, or principally

plaintiffs herein (*see e.g.* Conn Gen Stat § 38a-503e; Del Code Ann tit 18, § 3559; Me Rev Stat Ann tit 24-A, § 2847-G; Md Code Ann, Ins § 15-826; Mass Gen Laws Ann 176G, § 4O; RI Gen Laws §§ 27-19-48, 27-18-57, 27-20-43, 27-41-59; Tex Ins Code Ann § 1369.108; Wash Rev Code § 70.47.160; W Va Code §§ 33-16E-2, 33-16E-7; *see also* Mo Rev Stat § 376.1199; Nev Rev Stat § 689B.0376; NM Stat Ann § 59A-22-42).

Turning to our New York statute, prior to enacting the WHWA, the Legislature struggled with the issue of how to address the concerns of religious organizations opposed to contraceptives as a tenet of their faith. The question was to what extent and in what manner they should be exempted from the statutory requirements. As noted by defendant, an earlier version of the legislation included an exemption from the prescription coverage provision for any group or entity "operated, supervised or controlled by or in connection with a religious organization or denominational group or entity" (2001 NY Senate Bill S 3, § 11). It was mentioned in the course of the legislative debate that this exemption was modeled after similar language defining a religious organization or employer already existing in a New York statute (*see* New York State Senate Debate on Senate Bill S 5626, June 20, 2001, at 10421 [remarks of Sen. John Bonacic]; *see also* Executive Law § 296 [11]). It was further explained at that time that the legislation would include a provision whereby the employees of an exempt organization who sought to utilize contraceptives would be able to do so by means of a rider which, for a nominal cost, would allow the employees to purchase contraceptives at the reduced group rate (*see e.g.* New York State Senate Debate on Senate Bill S 5626, June 20,

---

supported by a church or by a convention or association of churches.

"(B) For purposes of this subsection, the term 'qualified church-controlled organization' means any church-controlled tax-exempt organization described in section 501 (c) (3), other than an organization which

"(i) offers goods, services, or facilities for sale, other than on an incidental basis, to the general public, other than goods, services, or facilities which are sold at a nominal charge which is substantially less than the cost of providing such goods, services, or facilities; and

"(ii) normally receives more than 25 percent of its support from either (I) governmental sources, or (II) receipts from admissions, sales of merchandise, performance of services, or furnishing of facilities, in activities which are not unrelated trades or businesses, or both."

2001, at 10353 [remarks of Sen. Joseph Bruno]).[2] According to defendant, this version of the legislation did not pass due to, inter alia, objections that the "broad exemption . . . would have encompassed hundreds of employers who, like [p]laintiffs, are engaged in the provision of . . . social services to the public at large." Along with other concerns,[3] certain of the legislators objected to the broader exemption on the basis that, even though the price of contraceptives with the rider would be cheaper than paying for them out of pocket, it was still more than the employees of nonreligious organizations would pay and, therefore, did not meet the statute's goal of covering as many employees as possible (see e.g: New York State Senate Debate on Senate Bill S 5626, June 20, 2001, at 10416).[4]

---

**2.** The record indicates that the religious organizations concerned were comfortable with this solution, presumably because it does not involve a situation where the religious employer would be "facilitating" the use of contraceptives in violation of its religious tenets (see New York State Senate Debate on Senate Bill S 5626, June 20, 2001, at 10356 [remarks of Sen. Joseph Bruno]).

**3.** One objection raised concerning the broad religious exemption was the fact that many of the religious organizations receive public funds (see New York State Senate Debate on Senate Bill S 5626, June 20, 2001, at 10408-10409). The relevance of that fact has not been well explained given that the WHWA applies to "all insurance plans purchased by employers and therefore [is] not at all tied to the receipt of public funds," nor does it appear that receipt of public funds renders a religious organization less "religious in character" (Stabile, *State Attempts to Define Religion: The Ramifications of Applying Mandatory Prescription Contraceptive Coverage Statutes to Religious Employers*, 28 Harv JL & Pub Pol'y 741, 758 n 74 [2005]).

**4.** Notably, the record debate did not appear to include a discussion of what effect there would be if the exemption were written less broadly and the nonexempt religious organizations chose to opt out rather than provide coverage in contravention of their religious beliefs. Although some legislators expressed concern about the employees of exempt religious employers being treated unfairly by having to pay a little more when utilizing the insurance rider, realistically, it is unlikely that any non-Catholic employee who, for instance, chooses to work for an entity such as plaintiff Catholic Charities of the Diocese of Albany could seriously claim to be surprised if direct access to contraceptives through the employer were not available. In the affidavit provided by plaintiff Carmelite Sisters for the Aged and Infirm, for example, it is stated that all prospective employees are specifically informed that they are expected to conform to Catholic strictures with respect to their employment. As noted by the majority, the Catholic Church's position on birth control is well known. "Employees who take employment with a Catholic employer do so with the understanding of the Church's position and with no expectation that the Catholic employer will act in a way inconsistent with its beliefs" (see Stabile, *State Attempts to Define Religion: The Ramifications of Applying Mandatory Prescription Contraceptive Coverage Statutes to Religious Employers*, 28 Harv JL & Pub Pol'y 741, 763 [2005]). Significantly, "just as employees choose not to work for particular employers for any number of reasons, em-

The version of the legislation that ultimately passed contained a much narrower religious exemption which applied only to a select group of religious organizations and was modeled on the statute enacted in California. Specifically, the WHWA includes an express exemption for "religious employer[s]" if prescription contraceptive methods are "contrary to the religious employer's religious tenets" (Insurance Law § 3221 [l] [16] [A]; § 4303 [cc] [1]). The WHWA defines a religious employer as an entity that satisfies four criteria: (1) the inculcation of religious values is the purpose of the entity; (2) the entity primarily employs persons who share the religious tenets of the entity; (3) the entity serves primarily persons who share the religious tenets of the entity; and (4) the entity is a nonprofit organization as described in 26 USC § 6033 (a) (2) (A) (i) or (iii) (Internal Revenue Code of 1986, as amended)[5] (see Insurance Law § 3221 [l] [16] [A] [1]; § 4303 [cc] [1] [A]). Any eligible religious employer who invokes this exemption is required to "provide written notice to prospective enrollees prior to enrollment with the plan, listing the contraceptive health care services the employer refuses to cover for religious reasons" (Insurance Law § 3221 [l] [16] [A] [2]). Notably, employees of such a religious employer are not deprived of the opportunity to obtain affordable contraceptives inasmuch as they are entitled "to directly purchase [a] rider . . . at the prevailing small group community rate" (Insurance Law § 3221 [l] [16] [B] [i]). Defendant acknowledges that the cost of the rider is low. Significantly, the statement of justification for the WHWA by its senate sponsor states that the legislation "also ensures that any enrollee not provided contraceptive coverage through a religiously exempt organization can otherwise directly access [it] from [his or her] basic health insurer at a cost that shall be the same as if the employer had not opted for the exemption" (Senate Introducer

ployees are free to avoid employment with Catholic entities if they are unwilling to accept the additional cost of contraception that is a consequence of the employer's compliance with a core position of the Catholic church" (id. at 763-764).

5. Four of the subject plaintiffs meet the fourth WHWA religious exemption requirement, namely, St. John the Baptist Church, Temple Baptist Church, First Bible Baptist Church and Carmelite Sisters for the Aged and Infirm. Pursuant to this exacting requirement alone, only an entity such as a church or religious order could realistically qualify for the exemption. However, as noted by plaintiffs, this tax return provision appears to have no relationship to the health care goals of the WHWA.

Mem in Support, at 2, L 2002, ch 554).[6] Thus, we are presented with a situation where the employees of nonexempt religious organizations are not guaranteed affordable contraceptives since, as pointed out by the majority, such employers can avoid subsidizing contraceptive use by simply not providing any prescription benefits to their employees. In contrast, employees of exempt religious employers always have the option of personally obtaining contraceptives at a reduced cost by utilizing the insurance rider.[7]

Significantly, plaintiffs herein are all nonprofit religious organizations, churches and religious orders that qualify for the status of religious employers in other statutory contexts such as employment and housing discrimination (*see* Executive Law § 296 [11]). As will hereinafter be explained in greater detail, it is our view that plaintiffs have successfully articulated a challenge to the WHWA based principally upon the religious exemption's overly-strict requirements that define what is "religious" conduct and determines that entities engaging in conduct deemed to be "secular" in nature are not entitled to exemptions from providing contraceptives in opposition to their

---

**6.** While the rates for the riders are approved by the State Insurance Department, Supreme Court estimated that the monthly cost to exempt religious employees to directly purchase the riders would be "on the order of $1.00 to $2.00 per month," an amount that appears, from one of the health insurance rate sheets in the record, to offset the savings to employees of exempt religious organizations realized as a result of the fact that their employer-provided prescription plans do not include contraceptive coverage.

**7.** Plaintiffs assert that they are disinclined to opt out of providing prescription benefits because it would violate their "sincerely-held religious beliefs regarding the moral obligation of employers to provide a dignified livelihood, including fair, adequate and just employment benefits, to their employees." However, as noted by one commentator, "when forced to confront the choice between participating in an intrinsically evil act and attempting to satisfy its obligation to pay just wages and benefits in another manner, some institutions may very well decide that ceasing to provide any prescription coverage is the lesser evil" (Stabile, *State Attempts to Define Religion: The Ramifications of Applying Mandatory Prescription Contraceptive Coverage Statutes to Religious Employers*, 28 Harv JL & Pub Pol'y 741, 774 [2005]). Inasmuch as defendant estimates that religious organizations in New York similarly situated to plaintiffs employ somewhere between 50,000 to 500,000 employees, a wholesale decision to opt out of providing prescription benefits by these employers would leave a significant number of workers without any prescription coverage. Indeed, "[a]ll employees of Catholic institutions would be worse off if this option is chosen. It will be little solace to a female employee of a Catholic employer to be told that she is being treated equally with male employees when equality can be achieved only by putting her in a much worse position than she was when she was theoretically being treated as less than equal" (*id.* at 774).

religious beliefs. Additionally, we are concerned that the strictures of the WHWA and its extremely narrow religious employer exemption could result in a smaller, rather than larger, number of women receiving prescription coverage, contrary to the stated goal of the legislation.

In a case of this nature involving various parties who have presented their respective arguments extremely well, it is often helpful to step back and focus on where they agree and disagree. Here, there can be no question that the Legislature recognizes the moral concerns voiced by the religious organizations who oppose the use of contraceptives as a matter of faith, which is why a religious exemption is included in the WHWA. Moreover, it is clear that plaintiffs are principally objecting to the statute's failure to exempt all bona fide religious organizations from its mandate. Thus, the real source of the controversy herein stems from the WHWA's definition of what constitutes a religious employer.

Plaintiffs argue that their conduct in providing social and educational services to all persons, regardless of their faith, is undertaken because of their religious tenets and they understandably object to the WHWA's clear determination that such activities are "secular." Plaintiffs raise a valid point. We fail to see where the record establishes that an organization is automatically secular and not religious in nature if it employs or serves persons of different faiths or engages in the provision of charitable or social services. Nor do we see that making such assumptions and engaging in the formulation of "religious test[s]" is an appropriate area of inquiry for the Legislature or the courts (*see Espinosa v Rusk*, 634 F2d 477, 480 [10th Cir 1980], *affd* 456 US 951 [1982]; *see also Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v Amos*, 483 US 327, 331 n 6, 339 [1987] [referring to a religious test formulated by the District Court to distinguish between secular and religious conduct as an "intrusive inquiry into religious belief"]). Instead, we endorse the view that "[w]hen, as here, particular purposes and activities of a religious organization are claimed to be other than religious, the civil authorities may engage in but two inquiries: Does the religious organization assert that the challenged purposes and activities are religious, and is that assertion bona fide?" (*Matter of Holy Spirit Assn. for Unification of World Christianity v Tax Commn. of City of N.Y.*, 55 NY2d 512, 521 [1982]; *see Matter of Faith Bible Church [Hudacs]*, 179 AD2d 308, 310-311 [1992]).

## II. Constitutional Issues

### A. Free Exercise—NY Constitution

Turning to the various constitutional challenges presented herein, we initially conclude that plaintiffs have established a meritorious claim pursuant to New York's Free Exercise Clause (NY Const, art I, § 3). As noted by the majority, the Court of Appeals has articulated a test that balances " 'the interest of the individual right of religious worship against the interest of the State which is sought to be enforced' " (*People ex rel. De-Mauro v Gavin*, 92 NY2d 963, 964 [1998], quoting *People v Woodruff*, 26 AD2d 236, 238 [1966], *affd* 21 NY2d 848 [1968]). "The process of the balancing of interests is twofold: first, a determination whether a restriction will be thus imposed on the individual's freedom of worship; and secondly, a determination whether the presence of a restriction is justified, after a consideration of the social and constitutional values involved" (*People v Woodruff, supra* at 238).

Significantly, the majority acknowledges that the legislation burdens plaintiffs' rights under the Free Exercise Clause of the First Amendment. Furthermore, in our opinion, there can be little question that plaintiffs have established that the WHWA restricts their right to freedom of worship. As for the issue of whether the restriction is justified under all the relevant circumstances, we do not find that the result of the balancing test favors defendant. Notably, defendant indicates that the competing state interests herein are the laudable goals of gender equity and "ensuring that the maximum number of women will receive necessary preventive health care." Defendant also goes into great detail in an attempt to show the detriments to employees without contraceptive coverage.

In balancing the stated competing interests, the majority finds significant the fact that plaintiffs employ persons of different faiths, a circumstance we do not find to be dispositive. Furthermore, the majority balances the free exercise issue in defendant's favor with the observation that "plaintiffs could avoid the contraceptive coverage mandate by withholding all prescription coverage."[8] However, such a course of action would clearly undermine the articulated state interest involved herein,

---

**8.** While it is possible that nonexempt religious employers could provide their own self-funded plans, there seems little to be gained by defendant encouraging that result since, not only would such plans not include contraceptive coverage, it cannot be assured that such plans would include the low cost insurance riders that currently allow employees of *exempt* religious employers

namely, ensuring that the maximum number of women receive the best possible health care. If, in fact, religious organizations such as plaintiffs "avoid" the contraceptive issue by withholding all prescription coverage or switching to self-funded plans, in our opinion, the justification for restricting plaintiffs' free exercise rights vanishes, tipping the scale in plaintiffs' favor on the issue of the WHWA's constitutionality. In sum, while we do not disagree with the majority's determination that the Legislature has presumably found facts which merit legislation aimed at promoting gender equity in the provision of health care, we cannot agree that a religious employer exemption that burdens religious employers' rights is itself justified in light of the fact that the exemption may ultimately cause a greater number of women employed by nonexempt religious organizations to be without adequate health coverage.[9]

## B. "Hybrid" Rights

Next, we disagree that plaintiffs have not articulated a valid claim under the US Constitution. As previously stated, the majority agrees that "the qualified mandated coverage for prescription contraceptives burdens [plaintiffs'] free exercise rights." However, since the WHWA is allegedly neutral on its face and generally applicable, the majority deems plaintiffs' free exercise claims to be insufficient to warrant strict scrutiny under the reasoning of *Employment Div., Dept. of Human Re-*

---

to purchase contraceptives at a low cost if so desired. Furthermore, the state's interest in advocating the WHWA can hardly be a significant one if it is tacitly encouraging religious organizations to avoid its strictures by funding its own plans.

**9.** Although the majority indicates that we are implicitly urging the broader religious employer exemption not adopted by the Legislature, the debate over its inclusion is long past. However, that is not to say that an overview of the history of a statute under review, as well as the approach taken by other states, serves no purpose. For example, since concern over whether there would be sufficient contraceptive coverage for plaintiffs' employees was one of the principal reasons for rejecting the broader religious employer exemption, it is especially troubling for us to see that plaintiffs' ability to opt out and not provide group coverage consistent with the WHWA is cited as one of the justifications for upholding the constitutionality of that statute. It must be remembered that no one here is arguing that persons *not* employed by plaintiffs are in any danger of losing coverage under the WHWA. The entire debate over the religious employer exemption, and the state's allegedly compelling interest, concerns only persons employed by entities such as plaintiffs. Thus, if the statute is upheld with the understanding that every nonexempt employer in plaintiffs' circumstances could opt out for religious reasons, one could well question the Legislature's purpose in enacting a religious employer exemption that not only excludes plaintiffs from its qualification but also plaintiffs' employees from access to the low-cost rider.

*sources of Ore. v Smith* (494 US 872, 899 [1990]). Assuming arguendo that the majority's assessment of the neutrality of the WHWA is correct, it is nevertheless our view that the combination of the free exercise claims with other First Amendment violations sufficiently constitutes a meritorious "hybrid" constitutional claim as described in *Smith* (*see id.* at 881-882).

## 1. Expressive Association

Specifically, we are persuaded by the claim that the WHWA violates plaintiffs' right to free speech under the US and NY constitutions. In our view, plaintiffs present a compelling argument in support of their expressive association claim. Significantly, plaintiffs allege that the WHWA imposes upon them an unwanted affiliation when they argue that a "compelled association exists because [plaintiffs] are forced to join the ranks of other employers and provide contraceptive coverage as part of their employee health plans."[10] Plaintiffs' concern over being grouped with employers who could well endorse contraceptive use is understandable in the context of their well-documented belief that contraceptive use is immoral. They contend that being forced to provide a message of support for contraceptives (by paying for them), "sends a distinctly different message" from their official position on the subject and "significantly affect[s] its expression" (*Boy Scouts of America v Dale*, 530 US 640, 656 [2000]). Thus, plaintiffs have persuasively demonstrated that requiring them to subsidize contraceptives as the sole means of providing group prescription coverage to their employees is inconsistent with their values and "impairs their collective longstanding, publicly stated and commonly understood position that such devices and drugs are immoral and should not be used." Consequently, we believe the WHWA violates plaintiffs' freedom of expressive association (*see id.* at 656-657).

## 2. Conduct as Protected Speech

Additionally, we find that the facilitation of contraceptive coverage by plaintiffs, even when the cost to the employer is

---

**10.** Unlike the majority, we find plaintiffs' arguments that they not be included with other groups that do not object to the facilitation of contraceptives coverage to be well represented in both their briefs and the record before us, particularly in their strong objections to being included in the grouping of "secular" employers, as opposed to "purely religious employers." Plaintiffs clearly convey their adherence to their beliefs regardless of whether those beliefs could be considered unpopular or outside the mainstream. Accordingly, we would not agree that plaintiffs' arguments should be disregarded.

negligible, violates plaintiffs' free speech rights because it compels them to engage in *conduct* that communicates a message of support for contraceptive use that is in violation of their religious beliefs.[11] Significantly, "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all[, and a] system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts" (*Wooley v Maynard*, 430 US 705, 714 [1977] [citation omitted]). Thus, in cases where a law has forced an individual to espouse a particular viewpoint or suffer a penalty for noncompliance, the United States Supreme Court has generally invalidated such a direction (*see e.g. Abood v Detroit Bd. of Ed.*, 431 US 209 [1977]; *Wooley v Maynard, supra* at 717; *Miami Herald Publishing Co. v Tornillo*, 418 US 241, 258 [1974]).

Here, plaintiffs advance a forceful argument that "financial support is a form of sponsorship or endorsement." As one com-

---

**11.** The majority's reliance on cases dealing with a government *restriction* of expressive conduct (*see e.g. Clark v Community for Creative Non-Violence*, 468 US 288 [1984]; *Tinker v Des Moines Independent Community School Dist.*, 393 US 503 [1969]) appears inapt under the circumstances. Plaintiffs have not alleged an impermissible time, place or manner restriction upon their speech or conduct. On the contrary, plaintiffs claim that the WHWA amounts to a *requirement* that they disseminate a particular philosophical viewpoint by implicitly endorsing the use of contraceptives. Under these circumstances, plaintiffs have no burden to establish that the conduct in question amounts to expressive conduct (*compare Wooley v Maynard*, 430 US 705, 714-715 [1977], *with Clark v Community for Creative Non-Violence, supra* at 292-293).

Nevertheless, we find considerable proof that plaintiffs intended to convey a message by *not* providing contraceptive coverage. For instance, the record establishes that, prior to the enactment of the WHWA, new employees of Catholic Charities "were informed during orientation that[, consistent with the teachings of the Roman Catholic Church,] coverage for contraceptive drugs and devices were not provided." One commentator persuasively suggests that a refusal to fund contraceptives is a form of political free speech closely linked to a free exercise claim (*see* Lowell, *Striking a Balance: Finding a Place for Religious Conscience Clauses in Contraceptive Equity Legislation*, 52 Clev St L Rev 441, 457 [2004-2005]). Significantly, echoed repeatedly in the record and in plaintiffs' brief is their unwavering assertion that the act of subsidizing coverage that their religion prescribes as morally evil cannot be condoned regardless of whether any employee actually utilized the coverage or how little it would cost them out-of-pocket to provide it. In fact, it seems clear that plaintiffs would oppose this coverage even if there were no cost to them or if doing so provided them a financial benefit. Accordingly, we find the message expressed by plaintiffs with their actions (and lack thereof) to be straightforward.

mentator aptly notes, "[i]t is not enough for religious employers to say they are morally opposed to contraception if they are simultaneously paying for employees to obtain it; the condemnation of the act is inauthentic if religious employers are paying for what they believe to be immoral" (Stabile, *State Attempts to Define Religion: The Ramifications of Applying Mandatory Prescription Contraceptive Coverage Statutes to Religious Employers*, 28 Harv JL & Pub Pol'y 741, 761 [2005]). Moreover, we do not believe that the Catholic plaintiffs' well-known opposition to contraceptives rules out the "conduct as expressive speech" issue. It is the fact that their opposition is so public and widespread which makes the Catholic plaintiffs, in particular, more susceptible to charges of hypocrisy, especially since, as has been emphasized, these plaintiffs could avoid supporting contraceptive use by choosing not to provide any prescription coverage to their employees. However, opting out of providing any prescription coverage to a religious organization's employees carries with it a penalty in addition to a violation of a religious employer's moral duty to care for its employees. It would be very difficult to argue that such an action would not also penalize the employer financially, since competitive employers must provide decent benefits packages to attract the most competent employees (*see* Stabile, *State Attempts to Define Religion: The Ramifications of Applying Mandatory Prescription Contraceptive Coverage Statutes to Religious Employers*, 28 Harv JL & Pub Pol'y 741, 774 [2005]).

In any event, given the meritorious arguments raised by plaintiffs pursuant to the Free Exercise and Free Speech clauses, we believe that a sufficient "hybrid" claim by plaintiffs has been presented under the *Smith* standard so as to warrant application of strict scrutiny. Notably, to meet the standard of strict scrutiny, a statute must be both justified by a compelling governmental interest and narrowly tailored to further that interest (*see Larson v Valente*, 456 US 228, 247 [1982]). Here, the WHMA's contraceptive mandate is not justified by a compelling governmental interest inasmuch as the state's interest in gender equity and ensuring that the maximum number of women receive health coverage bears little relationship to a statute that encourages certain nonexempt religious organizations to opt out of providing prescription coverage to their employees as the principal way to avoid compromising their religious beliefs. Clearly, a statute drafted in such an "all or nothing" manner is not narrowly tailored so as to expand benefit coverage to women and is, in our view, unconstitutional.

## C. Establishment Clause

We are also persuaded by plaintiffs' challenges to the WHWA pursuant to the Establishment Clause of the First Amendment. Assuming arguendo that the majority is correct in finding that plaintiffs cannot mount a challenge to the WHWA as applied, we are nonetheless unconvinced that the WHWA survives a facial challenge. While it is true that "statutes that give special consideration to religious groups are [not] *per se* invalid" (*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v Amos*, 483 US 327, 338 [1987], *supra*) and that "government may generally separate the religious from the secular to decide how it will dispense its benefits" (*Catholic Charities of Sacramento, Inc. v Superior Ct.*, 32 Cal 4th 527, 575, 85 P3d 67, 100 [2004] [Brown, J., dissenting]; *see e.g. Bowen v Kendrick*, 487 US 589, 609 [1988]; *Roemer v Board of Public Works of Md.*, 426 US 736, 746-747 [1976]), government should nonetheless not be allowed to "parse a bona fide religious organization into 'secular' and 'religious' components solely to impose burdens on the secular portion" (*Catholic Charities of Sacramento, Inc. v Superior Ct., supra,* 32 Cal 4th at 575, 85 P3d at 100 [Brown, J., dissenting]; *see e.g. Cantwell v Connecticut*, 310 US 296 [1940]; *Espinosa v Rusk*, 634 F2d 477, 481-482 [1980], *supra*).

In rejecting plaintiffs' claim that the various prongs of the WHWA exemption evidence a denominational preference (*see generally Larson v Valente, supra* at 244-246), the majority differentiates between a law which discriminates between denominations and one which merely discriminates "between those religious institutions that create separate legal entities for their ecclesiastical and ministerial activities, and those religious institutions that do not." In our view, this is a distinction with very little difference. For example, the differentiation between secular and ecclesiastical functions which is embodied in the inculcation prong of the religious employer exemption presupposes that sincere and meaningful religious expression exists only when a given religious sect is engaged in its ecclesiastical activities. On the contrary, a great many religious denominations—including several represented by plaintiffs herein—view acts of charity and other so-called "secular" pursuits as a significant manifestation of religious expression (*see Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v Amos, supra* at 344 [Brennan, J., concurring] [characterizing the provision of community service "as a means of fulfilling

religious duty and of providing an example of the way of life a church seeks to foster"]). To the extent that another denomination may not engage in any charitable endeavors whatsoever, the "inculcation-only" requirement implicitly affords a benefit to that denomination which is unavailable to one which engages in charitable functions, regardless of whether the latter denomination chooses to house its charitable activities in a separate legal entity.[12] Simply stated, we have great difficulty with a statutory scheme which explicitly dissects the laudable activities of a given religious organization into two unequal parts, i.e., secular and ecclesiastical, and affords only the ecclesiastical portion an exemption from mandated conduct which the entire organization deems objectionable. Inasmuch as "[j]udging the centrality of different religious practices is akin to the unacceptable 'business of evaluating the relative merits of differing religious claims' " (*Employment Div., Dept. of Human Resources of Ore. v Smith*, 494 US 872, 887 [1990], *supra*, quoting *United States v Lee*, 455 US 252, 263 n 2 [1982] [Stevens, J., concurring]; *accord University of Great Falls v National Labor Relations Bd.*, 278 F3d 1335, 1343 [DC Cir 2002]), we would subject this aspect of the WHWA to the exacting level of scrutiny deserving of an outright denominational preference (*see Larson v Valente*, 456 US 228, 247 [1982], *supra*). As in the context of plaintiffs' hybrid free exercise/free speech claim, application of strict scrutiny leads us to conclude that the statute is not narrowly tailored to serve a compelling state interest. We would ac-

---

**12.** It is worth reemphasizing that the inculcation prong at issue requires that the teaching of religious values be *"the* purpose" of the entity (Insurance Law § 3221 [*l*] [16] [A] [1] [a] [emphasis added]). Given the presence of the definite article in the statute, it is logical to assume that a religious organization may only be eligible for the exemption if its *singular* purpose is the promotion of religious belief (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 252; *compare* Ark Code Ann § 23-79-1102 [3] [B] [Arkansas religious employer need only have "one (1) of its primary purposes (be) the inculcation of religious values" in order to qualify for the exemption]). For example, Carmelite Sisters would be ineligible for the exemption because, according to plaintiffs, "their purpose is the inculcation of religious values but when offering health care services to the community through their members" that is not their purpose. Thus, the inculcation prong of the statutory exemption has the potential to do significantly more than merely distinguish between religious institutions that choose to exercise a ministerial function via an independent legal entity and those that do not. In our view, a group such as Carmelite Sisters, if it applied for the WHWA exemption, could find itself ineligible simply due to the fact that it has chosen to engage in pastoral work as a secondary purpose of its organization (*see Catholic Charities of Sacramento, Inc. v Superior Ct., supra,* 32 Cal 4th at 571 n 2, 85 P3d at 97 n 2 [Kennard, J., concurring]).

cordingly find the WHWA invalid under Establishment Clause principles on that basis.

Moreover, even if it cannot be said that the WHWA's division between "secular" and "ecclesiastic" does not, on its face, amount to the functional equivalent of a denominational preference, this distinction poses an additional significant Establishment Clause difficulty. Specifically, pursuant to the third prong of the tripartite test set forth in *Lemon v Kurtzman* (403 US 602 [1971]), it is our belief that the WHWA evinces a decided tendency to excessively entangle the state in the internal affairs of religious organizations (*see Catholic Charities of Sacramento, Inc. v Superior Ct., supra,* 32 Cal 4th at 582, 85 P3d at 105 [Brown, J., dissenting]).

It cannot be questioned "that religious freedom encompasses the 'power (of religious bodies) to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine' " (*Serbian Eastern Orthodox Diocese for United States & Canada v Milivojevich,* 426 US 696, 721-722 [1976], quoting *Kedroff v Saint Nicholas Cathedral of Russian Orthodox Church of North America,* 344 US 94, 116 [1952]; *see Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v Amos,* 483 US 327, 344 [1987], *supra* [Brennan, J., concurring]). Under the instant statutory scheme, however, a bona fide religious entity is, in effect, constrained to organize and conduct itself according to a particular model or suffer the consequence of finding itself ineligible for the religious employer exemption. In requiring that "inculcation of religious values [be] the purpose of the entity" (Insurance Law § 3221 [*l*] [16] [A] [1] [a]), the Legislature has interjected itself into the entity's internal governance and limited its organizational autonomy by requiring that the entity arrange its various subparts in such a way as to comply with the statute. In sum, this requirement compels a given religious entity to either engage in no allegedly "secular" endeavors whatsoever or compartmentalize those pursuits into subsidiaries in order to preserve exemption eligibility for the entity's "ecclesiastical" wing.

Furthermore, the separate requirement that the entity primarily employ individuals that share the entity's religious convictions has a three-fold coercive impact upon a religious organization's internal affairs. First, this qualification impliedly requires the entity to engage in a searching inquiry of its prospective employees in order to insure continued compliance

with the statutory mandate.[13] Beyond this, the statute requires that the entity ultimately refrain from employing otherwise qualified personnel who may not necessarily share the entity's religious beliefs. Finally, in mandating that the entity primarily serve individuals who share the same religious tenets, the Legislature unfortunately prevents the entity from indiscriminately serving the community as a whole, lest it unwittingly provide food, shelter or counsel to an excessive number of individuals who happen to have divergent religious beliefs. In our opinion, these exemption requirements, both alone and in concert, impermissibly intrude upon a religious organization's established "interest in autonomy in ordering [its] internal affairs" (*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v Amos, supra* at 341 [Brennan, J., concurring]). Such excessive governmental entanglement with the internal affairs of a given organization compels us to a finding that the WHWA is invalid (*see Bowen v Kendrick*, 487 US 589, 602 [1988], *supra*).

For all the above reasons, we find that the WHWA violates various clauses of the US and NY constitutions.

PETERS and CARPINELLO, JJ., concur with MERCURE, J.; CARDONA, P.J., and SPAIN, J., dissent in a separate opinion by CARDONA, P.J.

Ordered that the order is affirmed, without costs.

---

**13.** For instance, although Carmelite Sisters do assert that they employ and serve persons outside their faith, it is also stated in their affidavit that they "do not ask our employees to state their religious affiliation as a condition for employment." Thus, whether the population they employ and serve is "primarily" outside their Catholic faith is an open question unless they inquire of these persons about their beliefs as a means of complying with the religious exemption. Even if a religious organization chose to make such potentially controversial inquiries, there is no guidance as to how it should respond if the persons involved do not wish to share the particulars of their faith upon questioning. We do not believe that the fact that the statute seems to require employers seeking the exemption to make all the entangling inquiries (as opposed to the government) is dispositive of the issue, inasmuch as "the Constitution's protection is not limited to direct interference with fundamental rights" (*Healy v James*, 408 US 169, 183 [1972]).